Good morning. We have three cases to be argued this morning. The first is Jones v. Pennsylvania Board of Probation and Parole, No. 10-2944. And it's Mr. Nkowiak, is that right? And how do you pronounce your last name? Ossikow? Ossikow, Your Honor. Ossikow, thank you. Good morning, Mr. Court. My name is Bruce Nkowiak, and I appear as counsel for Mr. Jones in this case. I would request two minutes of rebuttal time, if I may. Yes, sir. That's fine. Your Honors have granted a certificate of appealability in this case on three very broad issues, one being the propriety of the claim that Jones made under the ineffective assistance of counsel doctrine, the second being procedural default, and the third being whether he filed timely within the one-year statute of limitations for habeas corpus proceedings. And I understand you also took this case pro bono, is that correct? Yeah, that's correct, Your Honor. I was appointed by the court. You're much appreciated. I'm honestly honored to receive the appointment, so thank you. The district court. The problem that I have in this case is just a simple, just sort of jump out at you issue, and that is that if you commit a crime in 2001, how in the world does anyone know that you're going to commit a crime several years later? You don't. So the information that supposedly was to have been imparted and allegedly was not in 2001, that if you're committed of another crime that you got a major problem, that's collateral, isn't it? Well, I think, Your Honor, it hits a large nail on the head in this case, but I think that it is a critical issue in this case about whether this collateral or direct issue is really the operative doctrine where it comes to the question of effective assistance of counsel. But how's counsel ineffective if we're not telling him that if you commit another crime, you could have additional consequences? But it's more than that in this case, because what Jones alleged in the district court was not simply that his counsel failed to tell him, but that he asked repeatedly because this was an important matter to him, and that counsel assured him that it would not have any further consequences. Now, of course, we haven't held a hearing in this case, and there's been no factual finding as to whether that could be made out as a consequence, but it was very clear that he came to the point of going to trial. He alleges that, in fact, his first plea proceeding blew up. But, I mean, that's a, I mean, there's any number of consequences. What if he goes for a job, and they say, we don't want to have a person who's been convicted of something? Does he go back at his attorney then and say, no, you didn't tell me about that? No, Your Honor, I think this is a key point, and it is this. I think what Padilla has recognized fully, although it's been in the law for a long time, is that this direct collateral consequences issue has resonance where the question is, what must the district court tell a defendant at a guilty plea to make that a proper guilty plea? The district court has the obligation to make sure that the defendant is waiving his rights at a knowing, intelligent way, and part of that is understanding all of those direct consequences of the plea. But the obligation of an attorney to a client is different. It's broader. The obligation of an attorney to a client. The obligation of an attorney to the client is to tell them direct consequences of a plea, but it's pretty clear it's not to tell them collateral consequences of a plea. Is that correct? I disagree with that, Your Honor. I think that Padilla has told us that the direct collateral consequence issue is not what governs the Strickland standard. I think that's one of the things that the court said. Now, granted, the court said that the deportation is a pretty important consequence. What's the case that supports that counsel must tell a defendant of collateral consequences? I don't think that that issue is presented in the case. I think what Padilla says is that collateral consequence, direct consequence, is not the formula to determine whether an attorney has been effective under Strickland in advising his client about a plea. But in Padilla, the penalty of removal was clear and explicit. You knew it from the get go. You plead to this, and they're likely, more than likely, to come after you, to remove you. Here, you plead in 2001. You know, I just want to let you know that if you commit a crime, oh, 2007, 2008, you could be a career offender, and there could be a huge jump in the sentencing range under the guidelines. So, you know, what was the range here, and what time did he ultimately get? Fifty-seven to seventy-one months without the career offender. Two-sixty-two was what he received under the career offender. But here again, Your Honor, this is my point, is that the way I read Padilla, and I've tried to cite from it extensively in the brief, is that the direct collateral consequence discussion is misplaced, where you're talking about what's the obligation of an attorney, and particularly in a case like this, where it's not simply the attorney running through a laundry list of things that might happen to you if you plead, but if it's in specific response to an issue that Jones claims was the absolute turning point of his decision to plead. An attorney can't do that. But it's a big one. Couldn't any defendant say, tell me everything that's going to happen, and when something is not covered in the list, then they're going to be back here before us, or before a district court? I don't, I don't think... It's the most general of questions. You know, how can this possibly affect me in the future? Will it affect me in any way? And if the lawyer doesn't happen to think of it, then it's ineffective assistance to counsel? Not necessarily. I think that Padilla covers that issue. Padilla says, look, after Hill v. Lockhart, there wasn't a flood of litigation over this, because the truth of the matter is that plea bargains are amazingly important to defendants because they get such a benefit out of it. And only somebody in a rare circumstance who really has a matter that he believes was the turning point of his guilty plea, and now he finds the rug pulled out from under him, is going to be able to come back, and even then, he has a daunting task to prove at a hearing. There's a bit of a grammatical issue there. The rug pulled out from under him, or he pulled the rug out from under himself. He's got to prove that, though. No, it was his later conduct. I mean, how do you distinguish the Salmon case from 1991, where which we said that the effect of a conviction on sentencing for a later offense under a career offender law is a collateral consequence, close quote, about which a defendant need not be informed before entering a guilty plea? Why doesn't Salmon control here? I mean... And I know Salmon well, because I represented Ray Washington in that appeal. But here's why, I think. First of all, I think Salmon has written before Padilla makes this clarification. Padilla said, we have never applied a distinction between direct and collateral consequences to define the scope of constitutionally reasonable professional assistance under Strickland. The direct collateral distinction has no bearing on this case. But in Padilla, again, back to the point that it was clear and explicit that there would be an automatic imposition of removal the minute you plead guilty to this type of offense. That's correct. And you knew it. Counsel, I mean, I just want to let you know, if you plead to this, they're going to try to remove you from the United States. In this case, what are you supposed to say? I just want to let you know that, you know, if you commit another crime down the road, you could be sentenced as a criminal offender. I mean, aren't you... If your... I'm sorry, go ahead. If your client asks you that question, yes, you tell them that. Because the law was still the same back then. The answer always has to be yes, though, to that, right? Because a lot of these predicate offenses, burglary, arson, with your knowledge and expertise, you're familiar with the several decisions the Supreme Court has come down with in the ACCA area, trying to just look at the residual clause cases, for example. Those are very tricky, and they're changing depending upon what the Florida State Supreme Court says about its burglary statute or whatever. So the answer is always yes, right? The answer certainly could never be no. It could never have any possible effects. And that's what Jones alleged the answer he was given here. The answer, at a minimum, if there's any gray area, is to tell them, look, there's very possible outcome that it could be. You have to take them into account. The right answer is no one knows what the future holds, sure, right? The wrong answer is no, don't worry about it. Don't worry. And that's what Jones alleged he was told here, and that's the real problem. And see, that's why, but see, Judge Hardiman, your question about the iffiness of some of these things, I think also emphasizes why it wasn't until he actually got sentenced that he was prejudiced, sentenced in federal court, that he was prejudiced to the degree that he had a claim to bring here in the first place. Well, let's just go to the timing of it. It seems like he missed two timelines here. He was under the PA statute, 9545B2. Yes. He's got 60 days, if he discovers of being notified in May of 2007, the government would be seeking to enhance his sentence based on the 2001 state court conviction. So why didn't he file something in those 60 days? Well, first of all, that section under the PA statute, Your Honor, and I've cited some cases in the brief to this effect, that section has been very narrowly construed by the Pennsylvania Supreme Court to apply to after-discovered exculpatory evidence. It's not like the Johnson case the U.S. Supreme Court decided in 2005, which I think is very important to the disposition of this case, but that section would not have availed him. But what it would have given him was taking an arrow out of the quiver of the other side by saying, well, he timely filed for PICRA in Pennsylvania. Well, I don't even think that. I think that he's out of Pennsylvania court completely on a couple of grounds. First of all, no matter when he would have gone back to Pennsylvania court, when we debate whether direct collateral consequences are an issue still in the federal system. The Pennsylvania system has an article of absolute faith. It says that if it's advice on a collateral consequence and you are dead wrong, it is not an effective assistance of counsel. They have, in fact, taken aliquotter on the Abraham case to decide whether they should continue that policy. So you're arguing futility? Absolutely. All right. But it's clear that the law says that you can be excused from failing to exhaust when it would be futile to do so. But how do you get around the Supreme Court statement in the Boosley case? And I'll quote, futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time. You still got to go through the hoops. He, well, first of all, his prejudice came in two forms here. First of all... Well, we're talking cause, not prejudice. I understand. The Pennsylvania courts have been completely close to the direct collateral issue the whole time. Him going back there would have been futile. Plus, after the one year after his guilty plea, the Pennsylvania interpretation of that one year statute of limitations is jurisdictional and it is absolute. I'm agreeing with you on that. I'm saying it's futile. I think you've nailed the case law on that. But what I just read from the Supreme Court is, as I read it, and tell me if I'm misreading it, is that unlike exhaustion, where futility excuses the failure to exhaust, futility cannot constitute cause. Well, let me just answer that, Your Honor, if I'm... No, we're fine, cause Judge Chigares has also a question. Very well. I would contrast that with the broader holding in the Johnson case. If I may, just for a moment. Johnson, of course, is very important on the issue of whether he filed within the one year for the habeas corpus. But the broader holding of Johnson is, you get one year after you have achieved the vacature of your prior conviction in state court. But you only get that one year if you have been diligent in seeking the vacature of that prior conviction. And the broader holding of Johnson is, we're going to judge whether you were diligent or not from how you proceeded from a given starting point. The critical question is, what's the starting point? The Supreme Court weighed up. Well, maybe when you get your federal indictment. Maybe when your federal conviction is affirmed. What they finally decided on was, we're going to judge diligence from the date you get sentenced in federal court as a career offender. From that point, you have to be diligent in trying to seek vacature. And if you win, then you can come back within a year and ask us for relief under your federal sentence. So I think even the Supreme Court there is suggesting that it's the occurrence of your federal sentence as a career offender that triggers the true bring. All right. And then you've got to go within 60 days to state court then? I don't think you have to go within 60 days in Pennsylvania because it's not an after-discovered piece of exculpatory evidence. Their rules are not the same as the federal court construes these – that one-year statute of limitations in the cases that they decide. They're brutal to be blunt about how they operate with this, and they have not engaged this. Let's switch to the timeline for the habeas. He was told in May of 07 that we're going to – if you're convicted, we're coming after you or we're going to note to the court this is a career offender. He's convicted in November of 07, I believe, and he was sentenced when? He was sentenced on May 12th of 08. Of 08. So if you time it from the sentence, you're fine in the one year because that's what you filed in March of 09? Yes. But you're on notice from May of 07 that you've got a major problem here. Why not file within a year after that? Why take the chance that you're going to be out of time for the habeas petition? Your Honor, he was – Jones – two reasons. Jones was no more on notice about the potential of that than Orasio was. At the time, Orasio pled guilty and was sentenced and was told in open court by the sentencing judge. You better be careful about the INS. You have to cooperate with the INS. But once he's convicted, he's darn sure that he's got a major problem. He knows that the government is going to seek it. Career offender status is not a night follows day determination like a mandatory minimum sentence would be, for example. If it was a mandatory minimum sentence, I'd have to agree with you. But career offender is a matter of discretion by the trial judge and it's judged on appeal, on abuse of discretion. And so until the trial judge would exercise discretion in order to give the career offender status, I think he's not prejudiced. And I think that's why the Johnson case has the rule it does. Thank you very much. We'll get you back on rebuttal. Mr. Ossoco. May it please the Court. My name is Ken Ossoco. I represent the appellee in this case. Initially, I'd like to turn to the latter, last matter that the Court was questioning the defendant, Mr. Antowiak, on. That is the statute of limitations. It's the Commonwealth's position in this case that pursuant to the You're talking about the P.A. statute or the habeas? The habeas statute. One year. The one-year habeas statute. Under that statute, the time for filing a claim occurs when the factual predicate could have been discovered with the exercise of due diligence. But your adversary says that, sure, we knew that was out there, but it didn't become really concrete until actual sentencing, and that happened within a year. Yeah, I mean, we've got another case in this sitting where there was a career offender, and the person got less than half of that. Actually, much less than half of that. Your Honor, the problem there is what his claim is, is that I would never have pled guilty if I had known of the potential, not whether it was actually going to be imposed. He was trying to seek to avoid the potential, according to his claim in his habeas petition and in his memorandums, he didn't want to even potentially face an enhanced sentence later. So that's his particular claim. So it became ripe when he became aware in May when he was put on notice of the government's intent to seek the enhancement, and certainly he knew when he was convicted of the crime and he was on notice. And it was clear, definite, and certain, we would submit, that the government was, in fact, seeking it, that it could be imposed, certainly at the latest he was aware in November of 2007 after his conviction. But he's not really prejudiced until the sentence is imposed. Well, Your Honor, the Commonwealth believes he was prejudiced, in fact, because the prejudice that inured to him was he was seeking to avoid even having to face an enhanced sentence, not whether he gets it or not. Then under that rationale, why doesn't the clock start ticking when he was first investigated for that offense, or arrested for that offense? Because at that point in time, there's no evidence that he was aware of the factual predicate that there was a career enhancement that was going to be sought, because the government has to seek it also. They have to put you on notice. Well, when they bring him in for questioning and we say, we think you've committed this crime and we'd like to talk to you about it, he's on notice. He's not on notice of the career enhancement situation. Sure he is, because he's on record notice of it, because when they say, we're investigating you for the consulted counsel, he'd be advised that that would be subjecting him to an enhanced sentence under the recidivist statute. But even at that time, Your Honor, the court, the government has to advise him that it's actually seeking the career enhancement. And in this particular case, it appears that there were two trials, and at the first trial, the government did not seek, did not put him on notice, did not seek a career enhancement penalty. It was only after that it was overturned. What cases tell us the triggering date is the date of filing an official 841 notice? I'm sorry, Your Honor? What cases tell us that your position is correct, that the triggering date here, for purposes of the statute, the one-year statute running, is in fact the date upon which the Section 841 notice is filed? I don't know that there is any particular case, Your Honor. What about Johnson? I mean, Johnson doesn't seem to be too good a case for your side. How do you square away Johnson? Your Honor, in the Johnson case, what the issue before the court was, was whether when he got the state case overturned or the earlier case overturned, the time for filing in Federal court. That isn't this case. It's the time for filing when he has to commence filing the Federal petition, the Federal habeas petition. So I don't believe Johnson is applicable. But even if the Federal statute of limitation doesn't bore him, the Commonwealth also submits that Pennsylvania law did not procedurally bypass or defaulted his claim. What about his claim that it is, you know, quote, brutal, close quote, and it's certainly futile to go to the Pennsylvania court with regard to something you know you're going to lose? Well, Your Honor, you never know whether you're going to lose. In that situation, Your Honor, you would never appeal cases which had already been decided adversely against you. You cannot always anticipate that a court's not going to reverse it. I think Mr. Rankowiak would submit that he'd bet a lot of money in Vegas what the outcome would be. Well, Your Honor, unfortunately, I've seen cases where both sides are shocked by outcomes that have reversed other cases. So you never know what is going to happen. I don't believe it would have been futile. But certainly, Your Honor, even then, and that's talking in terms of the November and the May 07, when he was convicted in 08, and again, at that point in time, the law may have been in Pennsylvania. It may have appeared to be futile. But had he filed it in that period of time in following his conviction in March, following his sentencing in May of 2008, by the time this case would have reached the Pennsylvania courts, Padilla would have come down. So we don't believe it would have been futile for him to have filed a petition. And as the Court has already indicated – Wait a minute. You're saying Padilla helps him? No, Padilla does not help him. But what Padilla would have done is then the Padilla issue would have been addressed by the Pennsylvania courts at that point in time. We do not believe Padilla helps him because, first off, in the Padilla case, the Court, while it talked about direct and collateral consequences, defined a collateral consequence as one within the sentencing authority, one within the sentencing authority. Well, your friend says that Padilla has basically obliterated the distinction between direct and collateral consequences. Is that so? We don't believe so, Your Honor. They say we're leaving it for a later day. We're not really deciding that particular issue. They said the fact that in that case, the consequence, deportation, was such a severe consequence, such a severe penalty, and it was intimately bound up with the immediacy of the criminal conviction. Once he was convicted of being an alien, he was automatically subject to deportation. And it was as if the Court said to him, not only are you getting X amount of time, but you're being deported as part of the sentence. Now, the Court couldn't do that because the sentencing court didn't have authority to deport him. But that was what Padilla said. In this particular case, that's not at all what occurred. In Padilla, again, in all the cases the defendant, the petitioner cites, in all those cases, the consequence flowed immediately and directly from the sentence, from the imposition of sentence. There was a parole issue, one of the cases, where he was misadvised. That flowed directly from the sentence that was imposed. Civil commitment case that the petitioner refers to, again, flowed directly. Again, as if the Court, when it sentenced the petitioner, said to him, not only are you receiving this amount of time in jail, but you're being deported. You're going to be civilly committed. You're going to be losing your parole time or whatever the parole time might be. You're going to be losing your pension, as in the Pennsylvania case, the Abraham case. It was automatic. No consequence flowed. Deportation isn't automatic. The status as deportable is automatic. Isn't that a distinction worth focusing upon? The Court in Padilla said it was clear and definite and succinct that he was going to be deported. In Padilla, what the Court said, that it was virtually certain. Deportable, right? Correct, Your Honor, but it was virtually certain. There are tens of thousands of people who are deportable, who are under orders of deportation who have not only not been deported, they haven't even been arrested or processed. Well, in the Padilla case, the Court spoke directly to it and indicated it was virtually certain it was going to happen. That's the Court's, the U.S. Supreme Court's language in the Padilla case, that it was clear and definite that that was going to happen. I think, without putting words in Mr. Inquiry's mouth, but the point being, why can't you say to your client, you can plead guilty to this, but I want to let you know, you come down the road, you do anything else, you are automatically eligible for a career offender sentence and the amount of time that you will get could be three or four times what you would otherwise get. I just want to let you know. Well, Your Honor, first in state court, perhaps an attorney has the obligation to advise him. There may be certain consequences. Whether or not an attorney is required, and I submit that he's certainly not required to know the laws of not only, again, we're in Pennsylvania State Court, he'd have to know if you're arrested in 49 other states, what the laws of those states were, what the laws in federal court were. The question isn't whether he tells a specific. An argument was made in Padilla that criminal lawyers can't be expected to be experts in immigration law. Isn't that more of a stretch than saying that state court practitioners should be knowledgeable of the federal recidivist statute? Well, what I'm saying, Your Honor, is that what Padilla also talked to the fact that they may not be knowledgeable and that they might have to advise him of the potential of certain things happening, not the certainty of it. In this case, the petitioner contends, in any event, that he specifically sought to learn that information. That's not what his petition actually says. What his petition in federal court actually said was he asked his attorney whether there would be any other consequence, imprisonment or otherwise, for that particular crime. And there was no other consequence for that particular crime. But more importantly, Your Honor, and again, we know there's no hearing been held on the issue of what counsel advised him, but the record we submit reflects that he clearly was on notice of those facts. The guilty plea colloquy indicated an offense in prior record score range, indicated he had in Pennsylvania a five, which would be basically the highest prior record score that you had, that as a result of having that particular prior record score, he was subjected to certain minimum sentences. Now, again, the court in Pennsylvania has discretion. But the point of Judge Hardiman's question is that you've got two separate disciplines, criminal law and immigration law. And the court said that you can have ineffective assistance of counsel. Here you just have criminal law. Maybe it's criminal law in a state court. Maybe it's criminal law practiced in a federal court. But usually counsel does both and is aware of both. So the bridge isn't very far here. And yet when the bridge is far between immigration and criminal law, nonetheless the court found ineffective assistance of counsel. I understand that. And what I'm indicating, again, the claim of the defendant petitioner is that he asked counsel that the record we submit reflects that he was on notice of it, not only by counsel because, as I indicated, the record reflects the ranges. He was on notice that he had this prior record score as a result of the prior record score, which is certainly factored into the sentence he was in. But you're saying he was on notice that he could be a career offender? Not a career offender, but that there would be that this conviction. Well, he knew he was in big trouble. Pardon? He was probably going to qualify for career offender status if he committed a federal crime. And I don't believe your argument that it would be expected that an attorney in a state court would, again, as I indicated, be required to know every particular jurisdictional's career offenders. They might be required to know and advise that your subject, because of this, it's certainly going to be factored into any sentence you receive in some other jurisdiction or even the state. So, again, there hasn't been a hearing, so we don't know all the details about what was said. Well, what we do know, though, Your Honor, is, as I indicated, he was on notice that he had this prior record score that was factored into the sentence he was receiving for that. He was on notice, and he indicated to the court in his guilty plea colloquy that counsel hadn't done anything, nobody had done anything, promised him, threatened him, or done anything, put any pressure on him at all to plead guilty. So I think the record reflects that his contention to the contrary is not true by the record. And the law in Pennsylvania is you can't basically lie to the court and then come back later and say, I lied to the court. That's what the petitioner we submit is seeking to do in this case. The record, as I indicated in his guilty plea colloquy, says, have you been promised anything? Have you been threatened? Has anybody done anything to put pressure on you to plead guilty? He's now saying, yes, they did put pressure on me or promised me that there would be no further sanction in this particular case. So what he's now saying is in direct contravention to what he said when he entered the plea in State court. Thank you very much.  As you're coming up, Mr. Nkoyiak, what rule would you want us to adopt in this case if you were writing the opinion? I'll put it bluntly. Don't take defense counsel off the hook. If you write a rule that says... Yeah, but that's a slippery slope. That would get us in a whole lot of trouble. No, no, no, no. It'll do wonders for the system. It would do wonders for our careers, too. Well, I would hope it would because I think if you say to defense counsel, if there's the rule that, look, if it's a collateral consequence, you don't have to answer the guy's question correctly. You can tell him anything. It won't matter. That is not the rule that we want to write. That's not the rule I think Padilla says should be the rule. Direct collateral, where it comes to the obligation of an attorney who is advising his client to waive a plethora of constitutional rights and submit himself to the jurisdiction of a court for sentencing, that attorney's obligation, minimally, is to answer a question the client brings to him about an important matter in the case and not just blow it off by telling him, oh, don't worry about it. It's going to be fine. Let's assume we're fully on board with your argument that this is not a wall between collateral and direct consequences. It's more of a sliding scale or not subject to labeling. Padilla, I think, tells us that the reason why ineffectiveness occurred is because the second that client of yours pleads guilty, you have rendered him deportable. The very act of pleading guilty has rendered him deportable. Here, what you've got to convince us of is that Padilla needs to be extended to back in 01, they're perhaps rendering themselves enhanceable depending upon what happens in the future. What's your argument to persuade us that the immediacy in Padilla is not a meaningful distinction? Your Honor, I think the meaningful distinction depends, goes to the issue of when is the client actually prejudiced by the bad advice he has received from counsel. In Padilla's circumstance, you're right. The moment he pled guilty, he pled guilty to a clearly deportable offense. There was very little that anybody had to do to deport him other than to show the record of that conviction. In Jones' case, what the thing that Jones claims he was misled about was not something that had the immediate consequence. It would have a consequence later on, but the consequence when it happened would be as onerous to him then as it was to Padilla now. It's simply a delayed notion of when that horrid prejudice would be visited upon you, but it doesn't make the advice any less ineffective. And the prejudice is always going to depend upon the bona fides of the person that pleaded guilty in 01. I mean, that's an odd species of prejudice, isn't it? When we talk about prejudice, typically it's not subject to future events to be determined later, many of which are perhaps, in this case, all of which are within the control of the actor himself. Well, but what was not in his control was his understanding of what that guilty plea meant at the time he entered it. What he relied upon, according to his testimony or his pleading, what he relied upon was advice that he got at that moment that let him cross that border and take that plea. And if that advice was ineffective assistance of counsel, the fact that he suffered the ultimate prejudice of it later on down the line simply means that it was a delayed reaction prejudice. And had he known he was subject to career offender designation, he would not have committed the crime in 07, you know, later. No, that's not the equation. The equation is whether he would have pled guilty in 2001. But when he later committed the crime, since ignorancia non excusat lex, I mean, by 06 or whenever he committed the crime, surely by then he knew that he had enough priors to make him subject to career offender status if he committed that later crime. I wouldn't necessarily attribute that to Jones or anyone else at this point. I know that the moment, and this is why, again, Johnson I think is important here because Johnson talks about what is that moment of prejudice for a defendant in a career offender setting. And I think it's when he gets sentenced. And before that, it's speculative and theoretical. The problem in 01 is you've got a counsel here who probably walked away thinking that she had done a great job. The person had a possible max of ten years, pled, got off two to four. He ends up getting out after two years. And everything that causes him to be here today is as a result of his own later violation of a federal law. If that's the case, how do you go back and blame counsel 11 years ago? The same way you could blame Padilla's counsel, the same way you could blame Because they may have done a wonderful job with respect to certain aspects of the case. But let's just say it's 2012, and this doesn't just apply. The reason I ask you, what rule would you write? Because it doesn't just apply to this case. It applies to all of them. So all counsel, it should be almost like a Miranda warning of defense counsel. Just want to let you know, I know you're pleading to this crime. But, my goodness, if you do something in 2018, another crime, you could be a career offender. No, Your Honor, because that kind of a rule would essentially backdoor the direct collateral consequences rubric. We would just be expanding what we're considering direct consequences. What I'm saying to you is this. The rule about counsel at a guilty plea is you have to give proper constitutionally valid advice to your client. If your client says to you, can this conviction be used against me later on? That's not a complex question. And if counsel in this case told Jones, no, it can't, that is ineffective advice. Almost what you're saying is that the next step was to be as part of the plea that the sentencing judge in a state court should let someone, I just want to let you know, in pleading guilty, not only do I want it to be a free plea here and a knowing plea, but you need to understand that if you are convicted of another crime in the federal system, you could be sentenced as a career offender. I would think that was not necessarily a rule to be applied in all cases. But what you're advocating, wouldn't the lesson of what you're advocating be every criminal defendant should say, tell me every consequence that could possibly happen here? And if they don't list everything like this, then we're loading up the courts with petitions from here until whenever. No, because in those cases, those defendants who would, again, I get back to what the Padilla court said. Why don't defendants do that? This has been the law. I mean, Jones filed this claim before Padilla was on the books. Why don't more people do this? For one very simple and extraordinarily compelling reason. The plea bargain they got was the deal of a lifetime. It saved them. They don't want to overturn it for any reason. It's going to be a rare case in which something like this happens, and Jones still has an incredible burden to carry if there's a hearing in this case to prove all of the things he needs to prove. Thank you very much. Thank you. Thank you, Your Honor. Thank you, counsel, for exceptionally well-made arguments. We'll take the matter under advisement. And again, thank you, Mr. Nkowiak, for taking this matter pro bono. Very much appreciated by us. Thank you, Your Honor.